IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE:    EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation | Case No. 2:17-MD-02785-DDC-TJJ |
| SANOFI-AVENTIS U.S., LLC,<br><br><br>          Plaintiff,<br>v.<br><br>MYLAN INC., et al.,<br><br><br><br>          Defendants,<br><br>This document applies to the *Sanofi* case. | Case No. 2:17-cv-02452-DDC-TJJ<br><br><br><br>**[Redacted Version]**<br><br><br><br>*Document Filed Electronically* |

**BRIEF IN SUPPORT OF BILL OF COSTS**

Deno Himonas
Jeremy Brodis
WILSON, SONSINI, GOODRICH & ROSATI
15 W. South Temple, Suite 1700
Salt Lake City, Utah 84101
Telephone: (801) 401-8510
dhimonas@wsgr.com
jbrodis@wsgr.com

*Attorneys for Defendant Mylan Inc. and Defendant and Counterclaim Plaintiff Mylan Specialty L.P.*

Mylan Inc. and Mylan Specialty LP ("Mylan"), pursuant to Local Rule 54.1(a)(2), submits the following in support of its concurrently filed Bill of Costs incurred in the action brought by Sanofi-Aventis U.S., LLC ("Sanofi"), case no. 17-cv-2452 (the "Sanofi case"). Mylan's Bill of Costs is timely filed because it was filed within the time permitted by the Court's May 15, 2023 Order granting the parties' joint request for an extension of time to file. Dkt. No. 2640. As set forth in Mylan's concurrently filed Bill of Costs, and based on the authority below, Mylan respectfully requests that the Court tax costs against Sanofi in the amount of $776,181.59 plus interest thereon from the date costs are taxed.

## I.     INTRODUCTION

In April 2017, Sanofi, one of the world's largest pharmaceutical companies, sued Mylan, the distributor of EpiPen, under Section 2 of the Sherman Antitrust Act. 15 U.S.C. § 2. Sanofi's antitrust claims sought significant damages. In defending itself, Mylan reasonably and necessarily incurred hundreds of thousands of dollars in costs.

On August 4, 2017, the Judicial Panel on multidistrict litigation ordered all related cases, including the Sanofi case, be transferred to this District for centralization under 28 U.S.C. § 1407. All transferred claims, except Sanofi's, were made by consumers and end purchasers ("Consumer Class") and were ultimately combined into a class action (the "Consumer Class Action"). In October 2017, this Court ordered the parties to engage in a period of "coordinated discovery," that would "include[] both the class plaintiffs' claims and the Sanofi plaintiff claims." Dkt. No. 1435 at 5 (explaining the history of discovery scheduling). The Court put the parties on a tight timeline and ordered that this phase of coordinated discovery—during which the parties were to conduct discovery on the areas of factual overlap between the class plaintiffs' claims and Sanofi's—be completed by October 31, 2018. *Id.* To meet that deadline, Mylan moved swiftly in light of the

substantial volume of documents and depositions involved. To comply with Sanofi's demands for extensive discovery of electronically stored information ("ESI"), Mylan incurred hundreds of thousands of dollars in expenses for ingesting hundreds of gigabytes of data, processing and converting it into a format required by the Court's ESI Protocol, and for providing copies of discoverable information to Sanofi. The data was drawn from over two dozen custodians, representing a span of more than seven years. Consistent with the Court's discovery orders, the parties conducted over 70 fact and expert witness depositions related to Sanofi's antitrust claims and/or Mylan's counterclaims against Sanofi.

In November 2018, this Court entered Scheduling Order No. 6, requiring that dispositive motions and Daubert motions in the Sanofi case be filed by June 28, 2019. Dkt. No. 1298. In June 2019, the parties filed cross-motions for summary judgment. In December 2020, this Court, in a 157-page ruling, granted Mylan's motion for summary judgment and dismissed Sanofi's claims in their entirety, holding that Sanofi failed to show any triable issue of exclusionary conduct and, independently, that Sanofi could not show it had sustained an antitrust injury sufficient to support a Sherman Act claim. Sanofi appealed, and on July 29, 2022, the Tenth Circuit unanimously affirmed this Court's decision. Sanofi then filed a petition for a writ of certiorari, which the Supreme Court denied on April 17, 2023. Per Fed. R. Civ. P. 54(d)(1), District of Kansas Rule 54.1, and 28 U.S.C. § 1920, Mylan now submits its Bill of Costs.

## II.    ATTEMPT TO CONFER

Pursuant to Local Rule 54.1(a)(2)(D), counsel for Mylan and counsel for Sanofi have conferred to resolve their disputes regarding taxable costs. In addition to having spoken, counsel have exchanged additional correspondence in an attempt to identify undisputed taxable costs. The parties were not able to reach agreement.

## III.    ARGUMENT

### A.    Legal Standard

Federal Rule of Civil Procedure 54(d)(1) provides that "costs—other than attorney's fees—should be awarded to the prevailing party." Fed. R. Civ. P. 54(d). This rule "creates a presumption that the district court will award costs to the prevailing party." *Cantrell v. Int'l Bhd. of Elec. Workers*, 69 F.3d 456, 459 (10th Cir. 1995). While "[t]he allowance or disallowance of costs is within the sound discretion of the district court," the Tenth Circuit has repeatedly made clear that "[d]enial of costs is a 'severe penalty,'" and therefore "there must be 'some apparent reason to penalize the party if costs are to be denied.'" *AeroTech, Inc. v. Estes*, 110 F.3d 1523, 1526-27 (10th Cir. 1997) (quoting *Klein v. Grynberg*, 44 F.3d 1497, 1507 (10th Cir. 1995)); *see also Burton v. Vectrus Sys. Corp.*, 834 F. App'x 444, 447 (10th Cir 2020).

Mylan is the prevailing party. Sanofi initiated this action against Mylan and this Court granted Mylan's Motion for Summary Judgment, dismissing Sanofi's claims of monopolization through exclusive dealing, deceptive conduct to further monopolization, and an overall scheme to monopolize. Dkt. No. 2254-1.[1] Sanofi appealed this judgment to the Tenth Circuit, and on July 29, 2022, the Tenth Circuit unanimously affirmed. *In re EpiPen (Epinephrine Injection, USP)*

---

[1] The summary judgment ruling also dismissed Mylan Specialty L.P.'s counterclaims against Sanofi. *Id.* But as the party who successfully fended off a much larger claim, Mylan is entitled to recover all taxable costs under § 1920—even those incurred in prosecuting its counterclaims. *See Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.*, 573 F.3d 947, 967 (10th Cir. 2009) ("A party need not prevail on every claim and counterclaim to be awarded costs as the prevailing party. In a case like this in which all claims and counterclaims have failed, costs may be awarded to the counterclaimant if it 'successfully fend[ed] off a large claim ... despite failure to prevail on a [smaller] counterclaim.'" (alterations in original) (citation omitted)); *Manildra Milling Corp. v. Ogilvie Mills, Inc.*, 878 F. Supp. 1417, 1425 (D. Kan. 1995) ("A prevailing party is presumably allowed all its costs unless there are grounds for penalizing that party."). Here, Sanofi sought significantly higher damages—indisputably a much larger claim than Mylan's counterclaims. It will also not be lost on the Court that, measured in terms of the scope of discovery and the volume of briefing, the time spent adjudicating this matter was heavily weighted toward Sanofi's claims and not the counterclaims. *See* Declaration of Brian Cuthbertson ("Cuthbertson Decl.") ¶ 13.

*Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 963 (10th Cir. 2022) (Dkt. No. 2627). Sanofi followed that loss with a petition for a writ of certiorari in the Supreme Court. On April 17, 2023, the Supreme Court denied the petition.

Section 1920 of the United States Code outlines the categories of costs taxable under Rule 54(d). *Albertson v. IBP Inc.*, No. 96-2110-KHV, 1997 U.S. Dist. LEXIS 15429, at *1 (D. Kan. Oct. 1, 1997). It provides that a judge or clerk may tax certain classes of expenses as costs. As the prevailing party, Mylan requests that the Court tax the following statutorily authorized costs against Sanofi: "(2) fees for printed or electronically recorded transcripts necessarily obtained for use in the case" and "(4) fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case." 28 U.S.C. § 1920. Once, as here, the prevailing party makes a showing that the statute authorizes a particular category of costs, "the burden shifts to the non-prevailing party to overcome the presumption that these costs will be taxed." *AgJunction LLC v Agrian Inc.*, No. 14-CV-2069-DDC-KGS, 2016 U.S. Dist. LEXIS 70066, at *6 (D. Kan. May 27, 2016) (internal quotation marks and citations removed).

Below is a summary of the costs the Court should award to Mylan in this litigation.

## Table of Mylan's Claimed Taxable Costs

| Cost Category | Taxable Amount |
|---|---|
| Deposition Fees (28 U.S.C. § 1920(2)) | $383,876.84 |
| Physical Copying (28 U.S.C. § 1920(4)) | $120,818.73 |
| Electronic Copying (28 U.S.C. § 1920(4)) | $271,486.02 |
| **Total** | **$776,181.59** |

**B.     Mylan's Deposition Fees Should Be Taxed to Sanofi**

Mylan is entitled to recover its deposition fees, deposition video costs, and transcript costs necessarily obtained for use in the Sanofi case in the amount of $383,876.84. By statute, the Court may tax fees for "printed or electronically recorded transcripts necessarily obtained for use in the case." 28 U.S.C. § 1920(2). It has long been the case in the Tenth Circuit that "[a] finding that a requested cost is statutorily authorized creates a presumption favoring their award." *Valdivia v. Ohse Foods*, No. 91-4284-DES, 1994 U.S. Dist. LEXIS 4164, at *3 (D. Kan. Mar. 23, 1994). This presumption carries substantial weight.

As a starting point, necessity is "readily demonstrate[d]" where depositions are "use[d] at trial by counsel or the court." *Sharon v. Yellow Freight Sys.*, 985 F. Supp. 1274, 1276 (D. Kan. Nov. 5, 1997) (quoting *U.S. Indus. v. Touche Ross & Co.*, 854 F.2d 1223, 1246 (10th Cir. 1988)). The same is true for depositions that were "utilized by the court in considering [a] motion for summary judgment." *Tilton v. Cap. Cities/ABC*, 115 F.3d 1471, 1474 (10th Cir. 1997) (quoting *Merrick v. N. Nat. Gas Co.*, 911 F.2d 426, 434-35 (10th Cir. 1990)). For similar reasons, depositions utilized by a party in presenting argument on summary judgment are likewise necessarily obtained for use in the case. *Miller v. City of Mission, Kan.*, 516 F. Supp. 1333, 1340 (D. Kan. 1981) ("depositions [that] were used in the successful motion for partial summary judgment . . . were reasonably necessary for use in the case"). Here, 45 of the 74 depositions for which Mylan seeks reimbursement were cited by this Court in the Court's order granting Mylan's motion for summary judgment. *See* Cuthbertson Decl. ¶ 5 & Ex. 6 (Detailed Deposition Appendix). Of the remaining 29 depositions, 18 were cited by at least one of the parties in their summary judgment briefing. *Id.* Mylan does not seek recovery for costs incurred for depositions directed solely towards the Consumer Class claims.

Further, even those depositions that were not directly cited by the parties are still taxable. Direct mention of a deposition is sufficient to prove necessity, but it is not necessary; the costs of depositions are taxable so long as the depositions "reasonably seemed necessary at the time they were taken." *Manildra Milling*, 878 F. Supp. at 1427. This is especially true where a case has been decided prior to trial. Because "caution and proper advocacy may make it incumbent on counsel to prepare for all contingencies which may arise during the course of litigation, including the possibility of trial," the court will not "employ the benefit of hindsight in determining whether materials for which a prevailing party requests costs are reasonably necessary to the litigation of the case." *In re Williams Sec. Litig. – WCG Subclass*, 558 F.3d 1144, 1147-48 (10th Cir. 2009). Rather, as long as the expense "'appeared to be reasonably necessary at the time it was' incurred, 'the taxing of such costs should be approved.'" *Id.* at 1148 (quoting *Allison v. Bank One-Denver*, 289 F.3d 1223, 1249 (10th Cir. 2002)).

The remaining 11 depositions were reasonably necessary at the time they were taken because each witness had knowledge of events that were relevant to the claims involved in the case. Of these remaining depositions, five were noticed by Sanofi.[2] And two others were witnesses Sanofi designated pursuant to Rule 30(b)(6).[3] Sanofi is hardly in a position now to contend that any of those seven was not reasonably necessary. The remaining four witnesses

---

[2] Dkt. No. 940 (Sanofi joined the notice of deposition of Pfizer Canada, whose designee, Sylvain Rocheleau, was deposed September 26, 2019); Dkt. No. 1103 (Sanofi joined the notice of deposition of WellCare Health Plans, Inc., whose designee, Lisa Templeton, was deposed on October 25, 2018); Dkt. No. 1105 (Sanofi joined the notice of deposition of Robert J. Coury, who was deposed on October 24, 2018); Dkt. No. 1203 (Sanofi joined the notice of deposition of Anthem, Inc., whose designee, Dr. Jeff White, was deposed October 31, 2018); Dkt. No. 1541 (Sanofi noticed the deposition of Dr. Karen M. Becker, a Mylan expert).

[3] Suzanne Paszkiewicz (deposed September 21, 2018) and Carrie Siragusa (deposed September 27, 2018) were both Rule 30(b)(6) designees of Sanofi.

were Douglas Brown (Magellan),[4] Spencer Williamson (kaleo),[5] Jez Moulding (Sanofi),[6] and Justin Works (Analysis Group),[7] each of whom, for the reasons described in footnotes four through seven, was likewise reasonably necessary to depose.

Because all of the deposition transcripts were necessarily obtained for use in the Sanofi case, Mylan requests that the Court tax the costs associated with those depositions in the amount of $383,876.84. *See* Cuthbertson Decl. ¶ 5 & Ex. 6 (Detailed Deposition Appendix) and Ex. 8 (supporting invoices).[8] Because that amount includes charges for additional deposition-related services, such as videography and expedited processing, Mylan explains its entitlement to those additional costs in the following sections.

### 1.    Videotaping and Stenographic Transcripts

The Court should tax Mylan's fees for the videotaping and synchronization of video to stenographic transcripts necessarily obtained for use in the Sanofi case. Multiple decisions in both the District of Kansas and the Tenth Circuit confirm that fees incurred for videotaped depositions

---

[4] Magellan Health was a third-party payor deposed regarding negotiations with Mylan and Sanofi for market access.

[5] Williamson was the CEO of kaleo, the company that licensed Auvi-Q to Sanofi. He was asked about Sanofi's marketing, the cost of the licensing agreement, and Auvi-Q's recall, all of which were relevant to Sanofi's weak sales, decision to abandon the product, and damages.

[6] Moulding was a Sanofi executive with responsibility for Auvi-Q sales and marketing in 2015, before the recall, during which Auvi-Q sales increased and its PBM access improved.

[7] Works was the Analysis Group consultant who prepared the sales forecast that formed the basis for Sanofi's belief that it should have had better access with PBMs and higher sales, which was incorporated into Sanofi's damages analysis. Mylan cited Mr. Works' forecast in its reply in support of motion to exclude Dr. Fiona Scott Morton, Sanofi's damages expert. *See* Dkt. No. 2290 at 4 (citing Ex. 1 thereto, at 148-50).

[8] The invoices were paid by Mylan. *See* Cuthbertson Decl. ¶ 6; Declaration of Lauren Thomas ("Thomas Decl.") ¶¶ 3, 4 & Exs. 17 & 18. Mylan notes that for eight of the depositions noticed by Sanofi, Mylan was essentially double-billed by the vendor. Mylan's understanding is that credits were issued such that Mylan ultimately paid one invoice per deposition. Consequently, Mylan seeks recovery here only for the lower of the potentially duplicative invoices, wherever they may have been for different amounts.

as well as stenographic transcripts are taxable. *See, e.g.*, *Tilton*, 115 F.3d at 1478 (finding that "in most cases" the costs for both videotaping a deposition and preparing a stenographic transcript of the deposition will be taxable); *Meredith v. Schreiner Transp., Inc.*, 814 F. Supp. 1004, 1006 (D. Kan. 1993) (explaining that awarding costs for both videotaping and stenographic transcript is consistent with the language of the statute); *Seyler v. Burlington N. Santa Fe Corp.*, No. 99-2342-KHV, 2006 U.S. Dist. LEXIS 92637, at *7 (D. Kan. Dec. 20, 2006) ("A party may recover costs of video depositions that are necessary for the litigation including the costs of the transcript and the videotape."). Indeed, the court in *Meredith* noted that "[t]he practice lawyers generally follow in this court, which the court endorses, is that a stenographic record must be made of a videotape deposition." 814 F. Supp. at 1006. The court went on to note that "[t]here are good reasons for this practice" and, as a result, it believed "the better practice is to allow the costs of both videotaped and stenographic depositions, absent some good reason not to do so." *Id.*

For these reasons, Mylan requests that the Court charge Sanofi with Mylan's costs associated with the videotaping and stenographic transcription of depositions in the amounts set forth in the accompanying invoices, as summarized in the attached chart. *See* Cuthbertson Decl. ¶ 5 & Ex. 6 (Detailed Deposition Appendix) and Ex. 8 (supporting invoices).

## 2.     Expedited Fees for Deposition Transcripts

Mylan is also entitled to the costs associated with expediting deposition transcripts and real time transcription services. Courts award such fees when they are reasonably necessary given the scope, scale, and nature of the case. *See AgJunction*, 2016 U.S. Dist. LEXIS 70066, at *11, *15 (fees for expediting are reasonably necessary in cases that are "sufficiently lengthy, complex, and contentious" and where parties "require[] expedited transcripts to prepare for . . . other depositions in the case"). The Court of Federal Claims recently recognized that extra costs associated with real-time transcription services or expedited delivery can be necessary in complex litigation. *See*

*Colonial Chevrolet Co. v. United States*, 161 Fed. Cl. 132, 145 (2022). This Court should reach the same conclusion here.

In making these types of determinations, courts account for the complexity and scope of the litigation. *See In re Williams Sec. Litig. – WCG Subclass*, 558 F.3d at 1150. Plaintiffs' own litigation choices are often a significant driver of defendant's costs: "the high amount of damages sought, the broad allegations asserted, [and] the complexity of the claims at issue . . . necessarily result[] in heightened defense costs." *Id.* Where "the stakes were indisputably high[,] . . . 'it was incumbent on [d]efendants to fully prepare their case on the merits.'" *Id.* (citation omitted).

So too here, the complex and high stakes litigation brought by Sanofi was the driver of Mylan's costs. Sanofi's claims against Mylan were broad, complex, involved intensive discovery, required expert and third-party testimony, and sought large amounts of damages. *See* Memorandum of Points and Authorities in Support of Mylan's Motion Summary Judgment, Dkt. No. 2295 at 4. To prepare its defense, and to appropriately prepare for witness examinations, Mylan required expedited transcripts both of depositions it noticed and those noticed by Sanofi.

Taxing these costs is well within the sound discretion of the Court. Where, as here, the case is complex and high stakes, with a significant volume of witnesses, equity favors awarding these costs to Mylan. In an effort to complete coordinated discovery by the October 31, 2018 deadline, between June 2018 and October 31, 2018, the parties conducted nearly 50 depositions—a rate of about ten depositions per month on average. Cuthbertson Decl. ¶ 5 & Ex. 7 (Summary Deposition Appendix) (listing depositions in summary form, organized by date to show the sequence and timing of depositions). In the month of October 2018 alone, the parties conducted over 20 depositions. Even at that pace, the parties required additional time to finish coordinated discovery, and between November and December 2018, the Court permitted another nine depositions (of

third-party payors) to be taken. In November 2018, this Court entered Scheduling Order No. 6, requiring that dispositive motions and Daubert motions in the Sanofi case be filed by June 28, 2019. Dkt. No. 1298. Accordingly, in April and May 2019, about a month prior to the deadline for dispositive and Daubert motions, the parties conducted over a dozen expert witness depositions. Expedited transcripts were needed to timely prepare for many depositions taken in such close succession, and to prepare for briefing as soon as possible after the expert depositions.

The Court should tax Sanofi with Mylan's costs associated with expedited transcripts and real-time transcription services, in the amounts set forth in the accompanying invoices, as summarized in the attached chart. *See* Cuthbertson Decl. ¶ 5 & Ex. 6 (Detailed Deposition Appendix) and Ex. 8 (supporting invoices ).

### C.     Mylan's Physical Duplication Fees Should Be Taxed to Sanofi

Mylan seeks recovery of the fees associated with the copying and duplication necessary for litigation, which are taxable as "fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case." A copy is necessarily obtained for use in the case within the meaning of the statute when "its procurement was reasonably necessary to the prevailing party's preparation of its case." *AgJunction*, 2016 U.S. Dist. LEXIS 70066, at *19 (quoting *Battenfeld of Am. Holding Co. v. Baird, Kurtz, & Dobson*, 196 F.R.D. 613, 617 (D. Kan. 2000)). As such, taxable copies need not have been used at trial. Rather, copies will be deemed necessary when, "at the time the copies were made, it appeared reasonably necessary that such would be used either in preparation for litigation or in pretrial matters." *Callicrate v. Farmland Indus., Inc.*, 139 F.3d 1336, 1341 (10th Cir. 1998).

Although the burden of establishing that copies were reasonably necessary falls to the party seeking costs, courts recognize that it is often impracticable for a prevailing party to provide a complete itemization of every copy made during the course of litigation. *See Seyler*, 2006 U.S.

Dist. LEXIS 92637, at *15. Indeed, requiring this level of detail from the prevailing party "would only further escalate the costs for all parties." *Id.* at *16. Rather, a court has discretion, based on "its own experience and knowledge of the case," to determine whether the costs submitted are reasonable. *Id.*; *see also Agjunction*, 2016 U.S. Dist. LEXIS 70066, at *7.

Here, Mylan incurred substantial hard costs in the duplication of documents used in both the preparation for litigation and in pretrial matters. *See* Declaration of Philip Sechler ("Sechler Decl.") ¶¶ 4, 7 & Ex. 1 (supporting invoices); Declaration of Jeremy Brodis ("Brodis Decl.") Ex. 4 (Summary chart of charges from outside duplication vendor DigiSource, LLC); Cuthbertson Decl. ¶ 29 & Ex. 15 (Summary chart of charges from outside duplication vendor Transperfect Legal Solutions) and Ex. 14 (supporting invoices).[9] These physical copies include documents reasonably necessary for use in case development, witness meetings, and deposition preparation, including deposition exhibits, expert materials, copies of transcripts, case filings, Sanofi exhibit lists, and other pertinent materials. The reasonable necessity of Mylan's copying charges can be seen from their juxtaposition with major events in the litigation. For example, a comparison of the dates for the requested copying charges with the dates of depositions taken during coordinated discovery shows that many of the copies were made in close proximity to those depositions, providing a natural explanation for why those copies were made. For the Court's convenience, Mylan encloses herewith a timeline compiling the dates of copying charges, depositions, and other

---

[9] Mylan paid these invoices, through its outside counsel, as confirmed by the attached emails from vendors DigiSource and TransPerfect confirming receipt of payment. Brodis Decl. ¶ 3 & Ex. 2; Thomas Decl. ¶ 5& Ex. 19. Many of the descriptions use the term "blowback". "Blowback printing refers to the printing process that is used to print copies of digital files, such as PDFs, especially in mass quantities. These digital files may be produced using a computer, but it is also possible that they previously were a printed file, which was scanned and digitized." https://www.acrophotoprint.com/blog/2018/january/what-are-blowback-printing-services-/ (last visited May 25, 2023).

case events identified on the docket. Brodis Decl. Ex. 5. As the timeline indicates, many of the copying charges occurred within the period immediately preceding expert depositions in the Sanofi case, further providing context and an explanation for these copying charges.

These copies were necessarily obtained for use in this case and the costs were reasonable given the large scale of the case, number of witnesses, and voluminous pleadings and documents involved. Mylan therefore requests that the Court charge Sanofi with Mylan's costs for the duplication and copying of documents in the amount of $120,818.73. Sechler Decl. ¶ 4 & Ex. 1 (supporting invoices); Ex. 4 (Summary chart of charges from outside duplication vendor DigiSource, LLC); Cuthbertson Decl. ¶ 29 & Ex. 15 (Summary chart of charges from outside duplication vendor Transperfect Legal Solutions) and Ex. 14 (supporting invoices).[10]

### D.      Mylan's Electronic Discovery Duplication Fees Should Be Taxed to Sanofi

Mylan seeks recovery for the fees associated with the copying and exemplifying of electronic discovery materials necessary for litigation. Following the 2008 Congressional amendment to 28 U.S.C. § 1920(4), courts have recognized that certain costs associated with electronic discovery now fall under the purview of taxable duplication costs.[11] The prior version of § 1920(4) authorized only the taxation of "fees for exemplification and copies of papers,"

---

[10] Mylan has voluntarily reduced the copying charges reflected in invoices accompanying the Sechler and Cuthbertson Declarations and, therefore, in the total, to exclude charges for binders, tabs, folders, and the like.

[11] *See, e.g.*, *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 674 F.3d 158, 171 (3d Cir. 2012) (costs of converting native files to TIFF and scanning paper documents are taxable); *Cnty. Vintner of NC, LLC v. E. & J. Gallo Winery, Inc.*, 718 F.3d 249, 259-61 (4th Cir. 2013) (costs of converting native files to TIFF and PDF formats and transferring files onto CDs are taxable); *United States ex rel. Long v. GSDMidea City, LLC*, 807 F.3d 125, 132 (5th Cir. 2015) (costs of converting native files to TIFF format and using character recognition are taxable); *Colosi v. Jones Lang LaSalle Ams., Inc.*, 781 F.3d 293, 296-98 (6th Cir. 2015) (costs of imaging hard drive are taxable); *Hecker v. Deere & Co.*, 556 F.3d 575, 591 (7th Cir. 2009) (costs of converting native files to readable format are taxable); *CBT Flint Partners v. Return Path, Inc.*, 737 F.3d 1320, 1328 (Fed. Cir. 2013) (costs for duplicating and producing electronic documents are taxable).

while the revised version allows "the costs of making copies of any materials" to be taxed. The change appears directed towards the broader inclusion of the evolving methods of electronic discovery now used in large-scale litigation.

The scope of what electronic discovery "qualifies as 'making copies' within the meaning of § 1920(4) is inconsistent throughout the nation," *Plaintiff A. v. Park Hill Sch. Dist.*, No. 21-cv-6153-SRB, 2023 U.S. Dist. LEXIS 28143, at *6 (W.D. Mo. Feb. 21, 2023) (citation omitted), and the Tenth Circuit has yet to directly address the recoverability of electronic discovery costs. This Court, however, has directly addressed the issue in *AgJunction* and concluded that "the Tenth Circuit, if presented with this issue, would follow the lead of other circuits and allow a prevailing party to recover expenses for copying and exemplifying electronic discovery materials, both for production in discovery or for use at trial, as taxable costs under § 1920(4) if 'necessarily obtained for use in the case.'" 2016 U.S. Dist. LEXIS 70066 at *7, *8.

To provide the Court with an overview of the e-discovery scope and scale in this case, Mylan provides the following background. In coordinated discovery, Sanofi, was responsible for seeking vast swaths of e-discovery from Mylan, with its first of many requests promulgated in late 2017. Cuthbertson Decl. ¶¶ 14-15.

To respond to these requests, Mylan was required to preserve and produce ESI in multiple specific formats with certain characteristics intact. The Stipulated ESI Protocol (the "ESI Protocol," Dkt. No. 70), entered by this Court on November 16, 2017, required the parties to produce ESI under exacting specifications, including:

1. Conversion of most native files to TIFF images (ESI Protocol at 3-4);

2. Production of text files, with a path to the text file contained in the database load file (ESI Protocol at 4);

3. Retention of all parent-child relationships within a document family, with the data regarding those relationships and associated Bates labels in the data load file (ESI Protocol at 5);

4. Extraction and production of more than three dozen categories of metadata (ESI Protocol at 5, 7, 22-25); and

5. Production of image load/unitization files, metadata load files, and delimited text files (ESI Protocol at 6, 19-21).

"[B]ecause the term 'copies' is construed to include copies of digital documents, any process or procedures inherent in producing a completed 'copy' of the final digital document must be recoverable, as the ultimate digital copy could not be completely and accurately produced but for the completion of those ancillary procedures." *Jo Ann Howard & Assocs., P.C. v. Cassity*, 146 F. Supp. 3d 1071, 1084 (E.D. Mo. 2015); *see also CBT Flint Partners, LLC v. Return Path, Inc.*, 737 F.3d 1320, 1328 (Fed. Cir. 2013); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 927 (9th Cir. 2016). "To the extent that a party is obligated to produce . . . electronic documents in a particular format or with particular characteristics intact (such as metadata, color, motion, or manipulability), the costs to make duplicates *in such a format or with such characteristics preserved* are recoverable as 'the costs of making copies . . . necessarily obtained for use in the case.'" *CBT Flint Partners*, 737 F.3d at 1328 (alteration in original) (emphasis added) (footnote omitted) (quoting 28 U.S.C. § 1920(4)); *see also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 928 (9th Cir. 2016) ("When copies are made in a fashion necessary to comply with obligations such as these, costs are taxable so long as the copies are also 'necessarily obtained for use in the case.'"). These "requirement[s] regarding the format of the copies to be produced may necessitate the taking of several steps that are all part of 'making copies,' reasonably understood." *CBT Flint Partners*, 737 F.3d at 1329. Additionally, "there is

no good reason, as a default matter, to distinguish copying one part of an electronic document (i.e., the part that is visible when printed) from copying other parts (i.e., parts not immediately visible) when both parts are requested." *Id.* at 1333.

Mylan complied with the ESI Protocol by hiring e-discovery vendor Consilio LLC, formerly known as Advanced Discovery, Inc. (collectively, "Consilio") to maintain a database for its custodial documents (the "Review Database"). Consilio provided certain services at a bundled rate for Mylan. For example, Mylan paid Consilio a per gigabyte rate for initial ingestion of data—a process that involved extracting text and metadata. Mylan separately paid Consilio a per gigabyte rate for "promotion" of data—i.e., the process of loading of native files into the database. Consilio's charges for these two steps included other services which Consilio provided but did not separately itemize, such as conversion to TIFF format, production, and project management time. Consilio also charged separately for associated storage/hosting. Mylan does not seek to recover every dollar spent on e-discovery but submits that it is entitled to the portion of the bundled charges attributable to the taxable portions of e-discovery that constitute "making copies" under § 1920(4). Accordingly, Mylan is voluntarily reducing its e-discovery costs by "unbundling" the charges and seeking recovery only for the portion of those unbundled charges that were necessary for making copies.

The costs Mylan seeks fall into six general categories, each of which courts have recognized as taxable under § 1920(4) as a part of the cost of making copies: (1) processing charges, (2) promoting charges, (3) TIFF conversion charges, (4) charges for production of

documents as native files, (5) Bates-labeling charges, and (6) associated storage/hosting.[12] The

following table contains an itemization of the categories of e-discovery costs Mylan seeks:

**Table of Mylan's Claimed E-Discovery Taxable Costs**

| E-Discovery Category | Unbundled Amount |
|---|---|
| Processing | Redacted-Confidential |
| Promoting | Redacted-Confidential |
| Conversion to TIFF | Redacted-Confidential |
| Bates labeling | Redacted-Confidential |
| Production of natives | Redacted-Confidential |
| Storage/hosting | Redacted-Confidential |
| Sales tax | $12,049.46 |
| Sub-Total | $285,774.76[13] |
| After 5% Reduction for potential class-specific data[14] | **$271,486.02** |

---

[12] Mylan also incurred and paid for additional services that were necessary for the making of electronic copies, including project management time to facilitate the foregoing activities, but for the reasons discussed below, Mylan voluntarily excludes those charges here. The amounts discussed herein also exclude charges for document review by hourly reviewers, which were invoiced separately and are not sought. Cuthbertson Decl. ¶ 27.

[13] These amounts are broken out in further detail in Ex. 3 (Consilio Unbundled Costs-Review DB), a demonstrative summary of the taxable costs that are explained in more detail in the following subsections. The costs sought represent a fraction of Mylan's actual e-discovery expenses in this matter. *See* Cuthbertson Decl. ¶ 8 & Exs. 9, 10 (supporting invoices). The foregoing invoices were paid by Mylan. Cuthbertson Decl. ¶ 9; Declaration of Paul Ramsey ("Ramsey Decl.") ¶ 25.

[14] *See infra* Section D.8.

The costs Mylan contends are taxable under § 1920(4), and the calculations supporting these unbundled amounts, are explained in more detail below.

### 1.    Processing charges

Beginning no later than January 2018, Mylan gathered raw data from relevant custodians by running a list of initial search terms (the "Initial Search Terms"), and specifying a date range of January 1, 2009, through August 23, 2016. Cuthbertson Decl. ¶ 16.[15] The Initial Search Terms were provided to Sanofi and the Court, and Sanofi did not object to them.

The ESI that was identified as a result of these Initial Search Terms was provided to Consilio. This data was gathered and processed for the specific purpose of coordinated discovery in the multidistrict litigation. Cuthbertson Decl. ¶ 17. On the invoices, this charge is listed as a line item for "XpressLook EDA Processing." This process includes the initial ingestion of raw files collected for each data custodian, from which text and metadata for each file is extracted and copied into the database, creating a searchable index that allows for term-based culling and organizing the documents, but does not allow for review of the document in anything but extracted text format. Ramsey Decl. ¶ 14.

This processing step was crucial to preserving the text files and metadata of all data that was subject to being searched in coordinated discovery in the manner that was required by the ESI Protocol entered by the Court. *Id.*

For processing of its custodial documents, Mylan paid Consilio a bundled amount of ▓▓▓▓▓▓▓ relating to 944.694 GB of data between January 2018 and June 2018, which included the cost of processing that data into Consilio's database, as well as other bundled services. Cuthbertson Decl. ¶ 18 & Ex. 9 (Invoices). Of the 944.694 GB, 786.3 GB was processed

---

[15] The list of Initial Search Terms is attached as Exhibit 11 to the Cuthbertson Declaration.

between January and March 2018, and is associated with the EpiPen MDL. *Id.* Although some amount of additional EpiPen MDL data continued to be processed in the Review Database after March 2018, Mylan voluntarily does not seek processing or promoting charges for that data, making the 786.3 GB a very conservative amount. At an unbundled rate, Consilio would have charged Mylan, conservatively, ▮ per GB or more for processing. Ramsey Decl. ¶ 17(a). Accordingly, unbundled, Mylan incurred ▮ (786.3 GB x ▮/GB) in processing charges that should be taxed against Sanofi.

### 2. Promoting charges

Having the extracted text and metadata processed allows for another round of search terms to be run against the extracted text and metadata without modifying the metadata. As the next step in creating copies of electronically stored information in the format and with the characteristics intact that are required by the ESI Protocol, Consilio promoted (i.e., loaded into the database) all of the gathered documents that contained search term hits that were identified using a "final" set of search terms (the "Final Search Terms") that Mylan and Sanofi agreed upon with the Court. Cuthbertson Decl. ¶¶ 20-21 & Ex. 12 (Final Search Terms). This was necessary for the native files to be available for review and eventual production. Ramsey Decl. ¶ 14. The costs associated with loading a copy of the ESI in a format that is compatible with the database are taxable costs. *See, e.g.*, *Nero v. Am. Fam. Mut. Ins. Co.*, No. 11-cv-02717, 2013 WL 5323262, at *2-3 (D. Colo. Sept. 23, 2013) (allowing costs for "the amount spent on loading data into an electronic database and converting files to TIFF or PDF formats").

As invoiced, Mylan paid Consilio a total bundled amount of ▮ relating to 455.590 GB of data, which included the cost of promoting that data in Consilio's system, as well as other bundled services. Cuthbertson Decl. ¶ 21 & Ex. 9 (Invoices). Of the 455.590 GB, 423.91 GB was promoted between January and March 2018, and is associated with the EpiPen MDL.

*Id.* Although additional EpiPen MDL data continued to be promoted in the Review Database after March 2018, Mylan voluntarily does not seek promoting charges for that data, making the 423.91 GB a very conservative amount.  At an unbundled rate, Consilio would have charged at least ▮▮▮ per GB for promotion, Ramsey Decl. ¶ 17(b), which means Mylan incurred ▮▮▮▮▮▮▮ (423.91 GB x ▮▮▮/GB) in unbundled promotion charges. The Court should tax the unbundled costs of promotion against Sanofi.

### 3.      Charges for conversion to TIFF format

Part of the e-discovery process, and one required by the ESI Protocol in this case, requires the creation of TIFF files (static images) for certain file types before production. ESI Protocol, Dkt. No. 70 at 3-4. TIFF conversion is a taxable cost. *See, e.g.*, *In re Online DVR-Rental*, 779 F.3d at 931-32 (holding "optical character recognition, conversion to TIFF, and other activities essential to the making of copies necessary to the case" are taxable). At an unbundled rate, Mylan would have been charged ▮▮▮/GB to convert files to TIFFs. Ramsey Decl. ¶ 17(d).

Of the 720,505 documents that were hits on the Final Search Terms, at least 139,688 files, totaling 148.15 GB, were converted to TIFF format in the Review Database. Ramsey Decl. ¶ 22. At an unbundled rate of ▮▮▮/GB, Mylan would have paid ▮▮▮▮▮▮▮ for such TIFF conversion, which should be taxed against Sanofi.

### 4.      Bates labeling charges

Another category of e-discovery costs courts have taxed are those associated with Bates-labeling documents (also referred to as "Electronic Image Endorsement"). *See, e.g.*, *eBay Inc. v. Kelora Sys., LLC*, No. C 10-4947 CW (LB), 2013 WL 1402736, at *3 (N.D. Cal. Apr. 5, 2013) (taxing costs for electronic scanning and conversion to PDF, TIFF conversion, OCR, image endorsement/Bates stamping, slip-sheet preparation, blowback preparation, OCR conversion, native format, and load files). Sanofi has previously represented that such charges are taxable.

*See Sanofi et al. v. Glenmark Pharms,, Inc., USA et al.*, Case No. 1:14-cv-00264-RGA (D. Del.), Dkt. No. 347 ("*Glenmark*"), at 13 ("[C]osts associated with bates stamping documents are also taxable." (citing *Lab. Skin Care Inc. v. Ltd. Brands, Inc.*, No. 06-601-LPS, 2016 U.S. Dist. LEXIS 42098, at *8 (D. Del. Mar. 30, 2016)); *O'Donnell v. Genzyme Corp. & Sanofi U.S. et al.*, Case No. 1:14-cv-01767-JG (N.D. Ohio Apr. 24, 2015), Dkt. No. 67-2 ("*O'Donnell*"), at 2 (relying on *eBay*, 2013 WL 1402736, at *7, for the proposition that "the following ESI costs taxable under § 1920(4): image endorsement/Bates stamping, [and] . . . electronically stamping Bates numbers.").

At an unbundled rate, Mylan would have been charged ▉ per label for Bates labeling. Ramsey Decl. ¶ 17(f). Through the end of coordinated discovery, Mylan had produced documents Bates-labeled through MYEP001362750, which means it had produced 1,362,750 Bates-labels. Cuthbertson Decl. ¶ 24. Accordingly ▉ should be taxed against Sanofi for Bates labeling.

### 5.   Charges for Production of Documents as Natives

Mylan incurred costs to produce documents as native files. Charges associated with exporting document productions, including as natives, are recoverable. *See, e.g.*, *eBay*, 2013 WL 1402736, at *7 (taxing costs of "native production"). Sanofi represented the same in *O'Donnell*, relying on *eBay*, 2013 WL 1402736, at *7, for the proposition that "productions in agreed-to native format" are taxable.

Here, 121.62 GB of documents had been produced as natives by Mylan through the end of coordinated discovery on October 31, 2018. Ramsey Decl. ¶ 23. At the unbundled rate of ▉/GB, Ramsey Decl. ¶ 17(e), this equates to ▉ for production of documents as natives, which should be taxed against Sanofi.

6.      **Associated storage/hosting charges**

Storage/hosting costs are taxable as one of the necessary steps of making copies of materials under § 1920(4). *See Charbonneau v. Mortg. Lenders of Am. L.L.C.*, No. 2:18-cv-02062-HLT, 2021 WL 4772939, at *8 (D. Kan. Oct. 13, 2021) (awarding costs for ESI hosting); *Pacificorp v. Nw. Pipeline GP*, No. 3:10-cv-00099-PK, 2012 WL 6131558, at *7-8 (D. Or. Dec. 10, 2012) (stating that "courts have allowed recovery for electronic storage of documents generally," and noting that "storage of electronic data throughout [the review, marking, stamping, and conversion stages was] required to prepare and produce the requested electronic discovery, requires no intellectual efforts, and may be properly taxed"); *see also In re Aspartame Antitrust Litig.*, 817 F. Supp. 2d 608, 615 (E.D. Pa. 2011) (finding that hosting costs were taxable because electronic databases allow parties to 'save costs associated with manually producing, handling, storing, and delivering thousands (and often millions) of pages of hard-copy documents"). Sanofi represented in *O'Donnell* that "costs charged . . . by an outside vendor for the conversion of electronic documents into reviewable format, **storage and access of that electronic data**" are all taxable. *O'Donnell*, Case No. 1:14-cv-01767-JG (N.D. Ohio Apr. 24, 2015), ECF No. 67-2, at 2 (emphasis added).

Here, Mylan was required to store all processed and promoted data in the Consilio database to preserve all of the electronically stored information and metadata so that it could be combined with the production information mandated by the ESI Protocol, such as the load files, and converted into the different formats mandated by the ESI Protocol. Ramsey Decl. ¶ 14. Mylan was charged ▮ per GB to store data within the database. For convenience and to save costs, Mylan utilized a database that already had other materials stored in it. Cuthbertson Decl. ¶ 25 That database had 1,183.07 GB of data in it as of December 2017—immediately before Mylan began processing and promoting data associated with coordinated discovery in this multidistrict

litigation. *Id.* The additional data, i.e., above 1,183.07 GB that was stored in the database from January 2018 through October 2018 was primarily associated with this multidistrict litigation, though a small amount of the data is not. *Id.* Based on the percentage of data that was processed and promoted for the EpiPen MDL during January 2018 through March 2018 compared to data processed and promoted from April 2018 to October 2018, it is conservative to estimate that, 85% or more of the gigabytes of additional data that entered the Review Database between January 2018 and October 2018 are related to the EpiPen MDL. The basis for this estimate is that over 786.3 GB out of 944.694 GB (over 83%) of the gigabytes processed were for the EpiPen MDL, and over 423.91 GB out of 455.59 GB (over 93%) of the gigabytes promoted were for the EpiPen MDL.

As set forth on Exhibit 3, the storage charges for the storage of data above 1,183.07 GB for each month between January 2018 and October 2018 resulted in charges of ███████████.  To account for the presence of data not related to the EpiPen MDL that was added to the Review Database between January and October 2018, Mylan voluntarily reduces this amount by 15% (which is extrapolated but conservatively so) to ███████████ (███████████ x .85). These storage costs should be taxed to Sanofi as a necessary component of the above-described copying.

### 7.    Sales Tax

"Courts in . . . the Tenth Circuit have permitted recovery of . . . sales tax associated with" taxable e-discovery costs. *See, e.g.*, *Peterson v. Nelnet Diversified Sols.*, LLC, No. 17-CV-01064-NYW, 2020 WL 3978756, at *6 (D. Colo. May 20, 2020), *rev'd on other grounds*, 15 F.4th 1033 (10th Cir. 2021); *Johns Manville Corp. v. Knauf Insulation, LLC*, No. 15-CV-00531-RBJ-KLM, 2018 WL 2388556, at *3 (D. Colo. May 25, 2018) (taxing sales tax on e-discovery costs).

Here, Mylan incurred at least $14,175.84 ($314,716.91 total with taxes - $300,541.07 subtotal) in taxable sales tax costs. Exhibit 3.  Consistent with the reductions Mylan has voluntarily applied above for certain Review Database costs that were not specific to the EpiPen MDL, Mylan voluntarily reduces the sales tax costs it seeks by 15%, and requests $12,049.46 ($14,175.84 x .85) be taxed against Sanofi.

### 8.    Reduction for Potential of Class-Specific Data

Mylan acknowledges that a subset of the above activities, from processing through storage, may arguably have been related solely to the Consumer Class Action, which featured some claims distinct from Sanofi's. But Mylan's analysis is that such data would have been a relatively small percentage of the data that was handled during coordinated discovery.

As discussed above, a final agreed upon set of search terms was used to generate the universe of documents promoted during coordinated discovery. *See* Cuthbertson Decl. ¶ 20 & Ex. 12 (Final Search Terms). Consilio ran a search to determine what portion of documents were part of that universe based solely on the search terms highlighted in yellow in Exhibit 16 to the Ramsey Declaration. Ramsey Decl. ¶ 20 & Ex. 16.  The data associated with the highlighted search terms (but which would not have returned in searches for the non-highlighted searches) represents only 5% of the total data. *Id.* ¶ 21. Mylan submits that the highlighted search terms constitute those search terms that are (arguably) more closely related to issues presented solely by the Consumer Class Action—though even that is debatable. Mylan has chosen to employ an over inclusive approach. Thus, even if those highlighted searches had been excluded entirely, that would hardly have had an impact on the overall volume of electronically stored information and associated costs.  Nevertheless, Mylan voluntarily reduces its overall e-discovery costs by 5% to account for the presence of any arguably class-specific portion of its e-discovery costs.

In sum, as itemized in Exhibit 3, Mylan incurred $314,716.91 in e-discovery costs for the Review Database, of which $285,774.76 remains after applying the deductions described in the foregoing sections.  After a further voluntary reduction of 5%, $271,486.02 ($285,774.76 x .95) should be taxed against Sanofi.[16]

### 9.       Additional Charges: Project Management & Production Database

Mylan incurred additional costs in connection with e-discovery in this matter, but for the reasons discussed in this section, voluntarily excludes those charges from its requested totals.

**Project Management Hours.** At an unbundled rate, Mylan would have been charged ▮▮▮ per hour for project management time. During coordinated discovery, Mylan incurred 768.1 hours of such time for the Review Database. These amounts would include such services as coordinating the processing of data, facilitating the endorsement (Bates labeling and confidentiality designations) of documents, building load files, and coordinating the exporting of productions. *See, e.g.*, *CBT Flint Partners*, 737 F.3d at 1332 (determining "the creation of 'load files' is covered to the extent those files contain information required by the requested production"). The unbundled value of project management time in the Review Database was

---

[16] Mylan acknowledges that a subset of the above activities, from processing through storage, may arguably have been related solely to the Consumer Class Action, which featured some claims distinct from Sanofi's. But Mylan's estimate is that such data would have been a relatively small percentage of the data that was handled during coordinated discovery.

As discussed above, a final agreed upon set of search terms was used to generate the universe of documents promoted during coordinated discovery. *See* Cuthbertson Decl. ¶ 27 & Ex. 12 (Final Search Terms). Consilio ran a search to determine what portion of documents were part of that universe based solely on the search terms highlighted in yellow in Exhibit 16 to the Ramsey Declaration. Ramsey Decl. ¶ 20 & Ex. 16.  The data associated with the highlighted search terms (but which would not have returned in searches for the non-highlighted searches) represents only 5% of the total data. *Id.* ¶ 21. Mylan submits that the highlighted search terms constitute those search terms that are (arguably) more closely related to issues presented solely by the Consumer Class Action (though even that is debatable. Mylan has chosen to employ an over inclusive approach). Thus, even if those highlighted searches had been excluded entirely, that would hardly have had an impact on the overall volume of electronically stored information and associated costs.

**Redacted-Confidential**. Sanofi will challenge the portion of project management time spent on copying-specific tasks, as opposed to other arguably non-compensable project management tasks. Although Mylan is undoubtedly entitled to a portion of the **Redacted-Confidential**, it nevertheless voluntarily excludes from the amounts it requests all **Redacted-Confidential** to avoid burdening the Court with sorting through which project management hours are compensable and which are not.

**Production Database.** Mylan further incurred costs for a second database (the "Production Database") that housed data provided by Sanofi and by third parties in this multidistrict litigation. A subset of these third parties' documents were copied and re-produced to Sanofi and the Consumer Class at Mylan's expense, primarily to create versions of documents that contained appropriate confidentiality designations or Bates stamps. Cuthbertson Decl. ¶ 27. Mylan incurred hundreds of thousands of dollars in charges for processing, promoting, Bates labeling, storage/hosting, and project management hours in connection with the Production Database. *Id.* ¶ 29.

Although Mylan is entitled to the costs of making copies of certain materials in the Production Database, to narrow the areas of potential dispute and reduce the burden on the Court, Mylan voluntarily excludes all charges associated with the Production Database. But Mylan notes the magnitude of charges it incurred in connection with the Production Database for two reasons. First, the magnitude of those charges supports the overall reasonableness of Mylan's request for e-discovery costs—indeed, Mylan seeks only a fraction of the costs it actually incurred in connection with making copies. Second, Mylan explains these costs to provide additional context for why the Court should not apply any further reduction to the costs Mylan does seek. Rather, Sanofi should be held accountable for all of the e-discovery costs enumerated above, which as demonstrated are a subset of the taxable costs for which it is responsible.

"[T]he costs incurred by the winning side in responding to evidence-gathering requests is an expense that is logically shifted to the losing side." *Comprehensive Addiction Treatment Ctr., Inc. v. Leslea*, No. 11-CV-03417-CMA-MJW, 2015 WL 638198, at *2 (D. Colo. Feb. 13, 2015). This encourages parties "to make narrow, focused discovery requests, rather than going on broad, potentially expensive, fishing expeditions." *Id.* Sanofi's own litigation choices and aggressive course of discovery necessarily resulted in Mylan's defense costs. *See In re Williams Sec. Litig – WCG Subclass*, 558 F.3d at 1150. The Court should tax those costs against Sanofi.

### E. Costs Should Not Be Apportioned

Mylan expects Sanofi will argue that costs should be apportioned because some of the costs purportedly overlap with other EpiPen-related matters. One such matter is the consolidated Consumer Class Action that was administered alongside the Sanofi case in this MDL.[17]

There should be no apportionment of the costs that were specific to the Sanofi case, such as those incurred outside of coordinated discovery (e.g., costs associated with experts specific to the Sanofi case). For costs incurred for coordinated discovery, apportionment, if any, will be up to the sound discretion of the district court, which has broad leeway in this area to fashion an appropriate allocation, given the history and context of this proceeding. Here, although the

---

[17] Mylan understands that it is Sanofi's position that costs must be apportioned with respect to other litigation, in addition to the Consumer Class Action, that occurred either before or after the litigation with Sanofi. Such apportionment is improper. Section 1920 allows recovery for the costs of transcripts and making copies where "necessarily obtained for use in the case." Unlike the Consumer Class Action, which had coordinated discovery proceeding in parallel with the Sanofi litigation, none of those other matters were consolidated in this MDL. Mylan was able to reduce its costs in this matter by utilizing an electronic database that already contained certain electronically stored information that it produced in coordinated discovery, to Sanofi's benefit. *See* Cuthbertson Decl. ¶ 25. Mylan has taken great pains to exclude from its request any costs that were incurred because of the prior use of the database. And any subsequent litigation, which may have overlapping discovery, does not alter whether costs were incurred for use in this case. All costs sought herein were necessarily obtained for use in this case.

consumer class asserted claims based on similar allegations, Sanofi took a leading role in generating defense costs for Mylan, and Class Plaintiffs were not as significant a driver of costs during coordinated discovery. Cuthbertson Decl. ¶ 14. Indeed, a substantial majority of the deposition hours taken by plaintiffs during coordinated discovery were occupied by Sanofi's counsel. *Id.* If there is to be any allocation of the coordinated discovery costs, it should be much more heavily weighted against Sanofi and in Mylan's favor.[18]

## IV.    CONCLUSION

Sanofi "caused this litigation to be brought" and Mylan's "costs to be incurred" and now it "must 'make the prevailing [parties] whole.'" *In re Williams Sec. Litig. – WCG Subclass*, 558 F.3d at 1151. Accordingly, the Court should tax Sanofi with Mylan's costs as itemized in the concurrently filed Bill of Costs.

DATED:  May 31, 2023

Respectfully submitted,

s/ Deno Himonas

Deno Himonas
Jeremy Brodis
WILSON, SONSINI, GOODRICH & ROSATI
15 W. South Temple, Suite 1700
Salt Lake City, Utah 84101
Telephone: (801) 401-8510
dhimonas@wsgr.com
jbrodis@wsgr.com

*Attorneys for Defendant Mylan Inc. and Defendant and Counterclaim Plaintiff Mylan Specialty L.P.*

---

[18] Mylan acknowledges that it settled the Consumer Class Action and agreed to bear its own costs in connection with that settlement. But there is no risk that an award of 100% of Mylan's recoverable costs from Sanofi would be a double recovery. Mylan defeated Sanofi's claims and thus is entitled to its costs from Sanofi, but neither Mylan nor the Consumer Class prevailed against the other and thus neither yet had a right to costs against the other at the time of the settlement, so Mylan cannot be said to have *recovered* any costs from the Consumer Class.

## CERTIFICATE OF SERVICE

On this 31st day of May, 2023, the foregoing document was electronically filed with the

Clerk of the Court using the CM/ECF system, which provides a notice of such filing on each

attorney registered for ECF notification to the counsel of record in this case.

<u>s/ Deno Himonas</u>
Deno Himonas
Jeremy Brodis

WILSON, SONSINI, GOODRICH & ROSATI
15 W. South Temple, Suite 1700
Salt Lake City, Utah  84101
Telephone: (801) 401-8510
dhimonas@wsgr.com
jbrodis@wsgr.com

*Attorneys for Defendant Mylan Inc. and Defendant and Counterclaim Plaintiff Mylan Specialty L.P.*